Frost, J.
dissenting. It is necessary that the question, in this ease should be distinctly stated. Amelia Marchant was the prosecutrix in the Court of Sessions,-in an indictment for assault and battery, — when she was offered as a witness, it was objected that she was incompetent to give evidence in that court, because she was a free colored person. An issue was directed to the jury to try her status. After the evidence was closed, the presiding Judge instructed the jury, that only three classes of persons were known to the laws of this State; free white persons, slaves,' and free persons of color ; and that there was no intermediate fourth class, between colored persons and the free whites, enjoying peculiar rights, immunities and exemptions — and that the proper issue for them to decide was, whether Amelia Mar-chant-was a free colored, or a free white woman. It was said, incidentally, in the explanation of the law affirmed; (for there was no evidence which required any instruction on that subject) that it might be, if a member of an independent tribe separated from it, and became incorporated with the citizens of the State, such Indian would be recognized as a citizen, The Attorney General desired that the jury should be instructed to enquire and find whether she was “ a free colored person,” or of “free Indian descent.” This instruction was refused, on the ground that it was an immaterial issue; because the testimony of a person of “free Indian descent,” is not, under the Act of 1740, distinguishable from that of a person of free African descent. It’was not proposed by her attorney to submit to the inquiry of the jury whether Amelia Marchant was descended from a “ free Indian in amity with this State.” There was no evidence, whatever, to support the affirmative df that issue. The Court has not decided the other questions which are presented by the instruction of the Circuit Judge; but has adjudged that there was error in the refusal to present to the jury the issue required ; and, in that judgment, has affirmed that a person of “ free Indian descent” is competent to testify in the Superior Courts; and, consequently, is not included in the class of persons described in the Act of 1740, as free Indians;” nor subject to the provisions of that Act, relating to “ free Indians ;” but is included in the exception' of “ free Indians in amity with this Government.”
The Act of 1740 declares that “ all negroes, Indians, mulattoes or mestizoes, who now are, or hereafter shall be, in *454 this Province, and all their issue and offspring, bom and to kom; shall be and remain, forever hereafter, absolute slaves, and follow the condition of their mother.” “ Free jn¿¡ans¡ jn amity with this government, and negroes, mulattoes and mestizoes, who are now free,” are excepted. “ If any negro, Indian, mulatto or mestizoe,” shall claim his freedom, the same mode of trial is prescribed. On such trial, “it shall always be presumed that every negro, Indian, rnu-lattoe and mestizoe is a slave; unless the contrary can be made to appear.” The “ Indians, in amity with this government,” are excepted. Respecting them, it is enacted that “ the burden of proof shall be on the person claiming such Indian as a slave.” “ The evidence of all free Indians,” like that of slaves, is admitted, without oath, against slaves and free negroes, Indians (except those in amity) mulattoes and mestizoes. “All crimes and offences, committed by free ne-groes, Indians, (except those in amity) mulattoes or mesti-zoes, shalL be heard and adjudged in the same manner as is provided for the trial of crimes and ’offences committed by slaves.” The same crimes “committed by any slave, free negro, mulatto, Indian, (those in amity excepted) or mestizo,” are declared capital felonies.
Three classes of persons are described in the Act; Indian slaves, free Indians, and free Indians in amity with the government. What persons were comprehended in the several classes ? If there be any obscurity in the meaning of the Act, it is necessary to recur to the period when it was enacted, and enquire into the condition of the colony, the situation of the Indians, and their relations to the government of the Province, that-light may be derived fromcotemporaneous circumstances. What was the meaning of the Act then, must be the meaning now. A change of circumstances and of opinion, cannot repeal or vary its express provisions. If an amendment is necessary to modify the provisions of the Act, and accommodate them to the present condition of the class of persons it affects or to the present state of public feeling towards them, the Legislature is at hand. It is not for the Court to legislate, by construction.
It is well known that, in the early history of the Colony, Indian captives were made slaves. In the incessant wars which the tribes waged against each other, many captives were taken in battle, and many more by surprise and stratagem and were sold to the colonists. The colonists, in like manner, seized and enslaved as many as they could take of the hostile tribes. But it was not lawful to capture and make s'aves of the Indians in amity with the Government. On this account, many of the weaker tribes sought the protection of the Government, and acknowledged- their dependence, The number of Indian, slaves, taken as Gaptives, *455 was very great; so that after supplying the wants of the colony, many were shipped to the West Indies. Prior to( 1740, it is probable a large portion of the slaves m the colony were Indians. In the earliest tax Acts, returns were vequi-red to be made oí negroes and Indians, mulattoes and mes-tizoes.
The numerous tribes which occupied the Province were, during the early period of the settlement, collectively, formidable to the colony — many of them maintained their independence ; which was recognized by the Government, in frequent treaties made with them. They were, alternately, enemies and allies. . The Government, for its security, received as many tribes under its protection as would accept it, exercised a control over those which were friendly, regulated trade with them, prescribed the limits of their occupation, beyond which they should not pass into the territory granted to, and occupied by, the colonists; which was called the “ settlementwhile the colonists were prohibited from entering the territory assigned to the Indians, without a license. But the laws of the Province were not extended over them, nor was any jurisdiction claimed of their persons. They were subject to the laws and usages of their respective tribes. It was the sedulous care of the Government to per-serve the friendship of the Indians. The dangers which beset the colony from, their savage neighbours, and the great importance to its safety of extending and maintaining friendly relations with the tribes, are recited in frequent Acts. In every Act, and they are numerous, regulating the trade and intercourse with the friendly Indians, they are described as ' “ Indian nations in amity,” or “ Indians in amity.”
Besides these independent tribes, there was another class of free Indians, “for some particular merit set free,” as it is explained in the Act of 1712. This class, it is probable, was increased in number by individuals from the tribes who took refuge in the settlement from the cruelties of war, or after their tribes were dispersed or incorporated with some other tribe. Over this class, the Government did assume jurisdiction. By the Act of 1695, if “ any slave or Indian” shall take away any boat, <fcc. on the first conviction he shall receive thirty-nine lashes. By the fourth section, jurisdiction of such offence is given to one of the justices of the peace.
Indians in amity, were not included in the provisions of this Act; for, during the same Assembly, the Governor, or any one of the Council, was appointed a Commissioner to hear and determine all differences and controversies between Indian and Indian, and Indian and white man. By the 19th section of the Act of 1739, it is enacted that if “any Indian or Indians, living in the settlement,” shall refuse to make satisfaction, in a reasonable time after application made to a *456 magistrate, by any inhabitant, for any damage or injury done him by such Indian, the justice may order corporal punishment to be inflicted, by a constable, on- such Indian, according to the nature of the offence; such punishment not extending to loss of life or limb. By the 18th section, traders are forbidden to bring, in their employment, into the settlement, any Indian from the neighboring friendly tribes, on pain of being made liable for any damage such Indian might commit.
From this view of the condition of the Indians, it appears that it was no better than that of Africans. They were, in the same manner, made captives and enslaved; and bought and sold; as slaves were subjected to the same treatment, and intermarried with the African race; were manumitted for similar merit; and when separated from their tribes, and domesticated in the colony, were punishable for offences by a single justice. There was no such difference in their condition, character, or treatment, as would justify the inference of any discrimination between the races, in the legislation affecting them.
I come, then, to the construction of the Act of 1740. The terms “all free Indians,” and “free Indians” are sufficiently comprehensive to include all the Indians in the Province, which were not slaves. The exception of Indians “ in amity,” shews in how large a sense the words “free Indians,” were used in the Act; and that they would extend to the independent tribes if the latter were not excepted. But the Government had always abstained from the exercise of personal jurisdiction over the tribes. It was necessary, therefore, that they should be excepted. “ Free Indians in amity,” properly describes them. They were frequently described, in previous Acts oflegislation, as “Indians,” or “nations of Indians,” “in amity.” The terms had a well known signification. When a class of persons is found to answer the description, by no rule of construction can the terms of description be -extended to include other persons. It was not necessary to except the hostile tribes, for a state of war precludes the idea of one belligerent being subject to the laws of the other. Satisfaction for burning houses, and driving off cattle, and grievously wounding a white man, would not be enforced against Indians at war with the Province, by a constable serving a justice's warrant.
If it be argued that the exception would embrace wanderers from the tribes who might be found in the settlement; that may be admitted; so long as they acknowledged adherence to their tribes. But by long residence, or by other acts indicating that their connection with their tribe was dissolved, they would lose the benefit of the exception, which ¡pertained to them as members of a tribe or nation; and *457 they would then become subject to the laws and jurisdiction of the Province. ,
It is affirmed that free Indians, detached from their tribes and settled in the Province, were still embraced by the exception, by a sort of personal amity. The term “ amity,” is used in the Act, in its proper sense, when it is applied to the friendly relations of the Province with an independent nation or tiibe. The relation of amity can only exist between independent nations. Allegiance, expresses the relation of a resident to the Government under which he lives. Only by an arbitrary and forced perversion of the meaning of words, perfectly well defined and understood — can free Indians, residing in the Province, be brought within the exception, as being in personal amity with the Government. Such a construction would not be countenanced, if it were not necessary to maintain a predetermination.
By this construction, a distinction is created among the “ free Indians,” of such as were free by manumission, and such as were free by aboriginal right. The term, free Indians, comprehends both; and indicates no such distinction. No motive for a discrimination could be found in the superior condition or respectability of the aboriginal, over manumitted free Indians. The legislation of the Province had subjected free Indians, living therein, from an early period, to summary punishment by a justice of the peace; and by an Act, passed in 1739, they were subjected to the jurisdiction of a single justice, who might inflict corporal punishment, at his discretion, to satisfy the complaint of a white man. On what ground, then, can it be pretended that it was the intention of the Legislature not to subject them to the jurisdiction created by the Act of 1740, so much more respectable and responsible than that to which they had theretofore been subject 1
If all free Indians, without distinction, were, in 1740, subject to the provisions of the Act then passed for the better government of the colored races, any free Indians who might, at any time after its enactment, have come and resided m the Province, would be incorporated with them, and be subject to the same law. Persons who are within the provisions of that Act, constitute the class known as colored persons, .and are incompetent to testify in the Superior Courts. If the construction of the Act of 1740, herein maintained, be correct, there is no intermediate c-Jass between the free colored and free white persons; and the issue presented to the jury was in conformity with the Act.
This view of the Act is sanctioned by what is said by Col-cock, J. in delivering the judgment of the Appeal Court in the case of the State v. Marsh. That was an application for a mandamus to the managers of election, for York Dis *458 trict, to receive the vote of the relator, John Marsh. The managers shewed, for cause, that the relator was an Indian of the Pamunky tribe, of Yirginia. He had been a soldier of the Revolution, had taken the oath of allegiance, and was a pensioner of the United States. The Judge says, “ the relator belongs to a race of people who have always been considered a separate and distinct, class, never having been incorporated into the body politic. Whether the policy which led to this is wise, is not for us to consider. Our ancestors thought so ; and all the laws of our State provide for the regulation of their affairs in a peculiar manner. When guilty of offences, they are tried by a particular tribunal, and in no respect are they considered as citizens.”
A distinction between persons of “ free Indian descent,” and of the like descent “in amity with the government,” as it may affect the question of jurisdiction over such persons, inhabitants of the State, and claiming to be of free Indian descent, has been adverted to in some cases ; and, in one case, seems to have the authority of a circuit decision, but it was never expressly or distinctly affirmed until the case of Charlotte Miller. In ex parte Terrett et al. in which application was made for a prohibition against the enforcement of a capitation tax, imposed by the City Council of Charleston, the relators were natives of St. Domingo, and were the descendants of a free East India woman and a white man.— The ordinance imposed the tax, which was the subject of the motion for prohibition, on “every free male person of color, whether a descendant of an Indian or otherwise.” It was held, that the relators were not within the provisions of the ordinance. In giving construction to the ordinance. Judge Colcock says, “ the word, Indians, unquestionably means slave Indians. It cannot be extended to the descendants of an East Indian and white man ; nor indeed to the descendants of any other free Indian, not impregnated with the blood of a negro. In a word, the ordinance can mean no other persons than the descendants of slaves, whether negroes or Indians.” One part of this dictum has been adduced .to shew a distinction between Indian and African blood, as if the former were more privileged. But in the last sentence, the distinction is negatived, when the descendants of Indian or African slaves are classed together. The case of Gray, was a motion for a prohibition to a court of magistrates, to restrain them from proceeding to try the relator, on a criminal charge; on the ground, that he, was descended from a free Indian woman, “ in amity with the State.” Judge Johnson, in delivering the opinion of the Court, says “ the suggestion, which is supported by affidavits, raises a strong presumption that the relator is not amenable to the jurisdiction of the magistrates.” The case went off on another ground ; *459 and that is all which is said on the subject of the relator’s claim to be exempt from the magistrates’ jurisdiction. This, casual dictum, on a point not considered in the judgment of the Court, it will not be pretended has any claim to authority.
A manuscript case of Adam Garden has been produced m the argument, and a very extraordinary one it is ; more important as a caution than as a precedent. Garden moved for a prohibition to a magistrates’ court, which was proceeding to try him on a criminal charge ; on the ground, that he was descended from a free Indian woman in amity. Major Garden proved that Adam was born a slave in his father’s family, of an Indian woman, whom his father owned before the witness was born. He had brothers and sisters in slavery. He was given to the witness by his father, and was sold to the witness’s sister. In 1795, Mr. Lowndes, trustee, sold Adam to Mr. Peter Smith. Adam and his mother agreed to refund to Mr. Smith the sum he had contracted to pay for him ; and Mr. Lowndes was requested to execute a deed of manumission. Adam never, until 1807 or ’8, pretended that he was entitled to the privileges of a white man. Col. J. H. Stephens was sheriff in 1799, and received from Adam the city capitation tax, which he continued to pay to the time of trial. He had petitioned the City Council to be exempt, but his petition was refused. Mr. Champnejrs and Mr. Lowndes and another witness confirmed the statement of Major Garden. Mrs. Bonneau said she knew Adam Garden — had heard his grandmother was an Indian. Mr. Yanderdissen was said to be the father of her two daughters — Flora and Rachael. Flora was the mother of Adam. It did not appear who was Adam’s father. Flora and Rachael were sold. The witness did not know whether their mother was bond or free. Indians were permitted to remain on plantations, and were considered free. John Henckley Mitchell said he- knew an old woman, aged about 70, apparently of good memory, named Hibben, who made an affidavit before him; That she declared she knew Adam, the son of Flora, who was the daughter of Rachael, a free born Indian woman. Mitchell further said that, in a conversation with him, Hibben said Flora’s mother was a free Indian woman, brought into this State by one Stewart, superintendant of Indian affairs, who said he had brought her from an Indian nation. Mitchell also swore that Mrs. Ramage, aged 72 or 3 years, made an affidavit before him, that Flora’s mother was a free Indian woman. It did not appear who these old women were; nor that their affidavits were produced; nor that they had any relation' to Flora’s family, or any means of knowing what they were said to have affirmed. On this evidence, 'the Justices and freeholders found Adam Garden to be of free Indian descent, and declined to take cognizance of his offence. A motion was made in the Circuit Court' for a mandamus, and the re *460 cord only shews that the motion was refused. The decla-ratious 0f Ramage and Hibben, if they proved anything, that Flora was a free Indian woman “in amity.”— qqle case is but a circuit decision. Adam again had to appeal from the magistrates’ jurisdiction, and also his son, Elias. Their claim was allowed; but these cases are no additional authority whatever, being only judicial recognitions of the personal right of Adam and his son, which had been adjudicated. The case of Miller v. Cramer, (also in MS.) was a similar recognition of the right established in Charlotte Miller’s case.
It is to be noticed that in all these cases, the plea to the jurisdiction of the magistrates’ court was, that the relators were of free Indian descent, “in amity” — that is, of free descent from a member of a tribe who had not been enslaved. They give no sanction to the judgment in this case, that the plea of “free Indian descent” merely, is sufficient to except the party from the Act of 1740. Nor does even the case of Charlotte Miller, whose plea was the same as that in the cases before mentioned.
I will now consider the case of Charlotte Miller. In that case it was held, that the descendant of an Indian woman, living in Charleston about fifty years ago, was within the exception of “ Indians in amity,” on the presumption that her grandmother belonged to an existing or extinct tribe of Indians. The grounds of appeal presented the question, on the construction of the Act of 1740, what persons were included in the exception of “ free Indians in amity.” In the judgment of the Court it is said, “ the section of the Act now under consideration was intended to regulate the trial of free Indians, not in amity with the government. If must have applied alone to such as were within the limits of the State; whether residing with the tribes or not, does not seem distinguished by the Act.” Then it must have been intended to regulate the trial of the tribes at war with the government. The government must have been in amity or at war with the tribes. If they were “ residing with the tribes,” they would be engaged in hostilities; and Indians, adhering to a hostile tribe, would not be permitted to remain in the settlement. The exception could not have applied to such Indians. It was admitted, in the judgment of the Court, that the government never exercised jurisdiction over the tribes of Indians who maintained a separate existence; and thatlndians who had wandered off from their tribes, or whose tribes had become extinct, by residence became amenable to the laws. Respecting these, it is said, “ the construction must either be that if the Indian, himself or herself, was in friendly relations to the white inhabitants ; or, if die or she belonged to a tribe of Indians in amity, they were to be treated as Indians in amity, and would not be liable to be tried under the Act of *461 1740.” It is farther said, “ if the tribe was extinct, then the amity of the Indian would be personal; and if the tribe were existing, it would be necessary to shew, actually or by presumption, that the tribe was in amity with the government.” In either point of view, it is said, the relator’s grandmother was an Indian in amity. If her tribe was extinct, by a personal amity ; and if not extinct, “it was properly put to the jury to presume, from fifty years’ residence, that she was to be regarded as a free Indian, in amity with this government.”
On such grounds rests the judgment of the Court in Charlotte Miller’s case. The reasoning by which the conclusion is reached, is not satisfactory. That can be attributed only to the impracticable view of the Act which was taken by the Court.
When, by this decision, it was held to be necessary to establish, by direct proof or by presumption, that the person claiming to be exempt from the provisions of the Act was descended from an “ Indian in amity,” a remnant of the “ free Indians,” for whose government the Act was passed, was left subject to its provisions ; “ free Indians in amity” being those only who could shew themselves to be free by aboriginal right, as having seceded from a tribe of Indians. Those who claimed only a “ free Indian descent,” that is, from a manumitted Indian, were still left to the operation of the Act.— But by the judgment of the Court in this case, these are excepted also. Thus, tribes or nations in amity, and nations at war, and all Indians of “free Indian descent,” comprehending every class of free Indians, in whatever manner they derive the claim to freedom, are by the decision excepted from the Act of 1740; and the same, so far as it provides for the goyernment of “free Indians,” is repealed by a construction, which imputes to the Provincial Assembly the absurdity of passing an Act for the government of free Indians in the Colony, and, by express exceptions in the Act, excluding the whole class from the operation of the law.
I shall not discuss the question whether the construction adopted by the Court, or that maintained in this dissent, better supports the policy of the State, or is more conducive to subordination, and the peace and good order of the-community ; though I have a very decided conviction on the subject. It is'the duty of a Judge to declare, and not to make, the law; to construe legislative Acts in accordance with the expressed intention ; and not in subserviency to his individual impressions of their wisdom or expediency. The Judge is not responsible for any objections to the law he may be required to enforce. If time and change of circumstances require an amendment, the Legislature is best and alone qualified to make it; and the government will be best administered when each department respects the limit of its appropriate sphere of duty.